Opinion by Judge KOZINSKI; Partial Concurrence and Partial Dissent by Judge TALLMAN.
OPINION
KOZINSKI, Circuit Judge:
In 2003, Joshua Frost was charged in state court with participating in an eleven-day spree of armed robberies and a burglary. Frost’s attorney wanted to argue during summation that the • state hadn’t met its burden of proof and, in the alternative, that Frost committed the crimes under duress. The King County Superior Court erroneously refused to allow counsel to make these alternative arguments, so he chose to argue duress. The Washington Supreme Court held that the superior court’s error was harmless. State v. Frost, 160 Wash.2d 765, 161 P.3d 361, 370-71 (2007) (en banc). In a previous en banc opinion, we held that the restriction on Frost’s closing argument was structural error. Frost v. Van Boening, 757 F.3d 910, 918-19 (9th Cir.2014) (en banc). The Supreme Court reversed. Glebe v. Frost, — U.S. -, 135 S.Ct. 429, 432, 190 L.Ed.2d 317 (2014) (per curiam). We must now decide whether Frost is nevertheless entitled to habeas relief because the error, though not structural, was prejudicial. In addition,-we consider Brady and Napue issues that the district court'did not certify for appeal.
DISCUSSION
I. The Harmless. Error Issue
Our review of the Washington Supreme Court’s harmless-error decision is governed by the Antiterrorism and Effective Death Penalty Act. See 28 U.S.C. § 2254(d)(1) (requiring petitioners to demonstrate that a stqte court’s decision on the merits is “contrary to, or involved an unreasonable application of, clearly established [f]ederal law” to obtain habeas relief). We may reverse the state supreme court’s harmlessness determination only if Frost experienced “actual prejudice,” that is, where we have “grave doubt about whether a trial error of federal law’had ‘substantial and injurious effect or influence in determining the jury’s verdict.’” See Davis v. Ayala, — U.S. -, 135 S.Ct. 2187, 2197-98, 192 L.Ed.2d 323 (2015) (quoting O’Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) and Brecht v. Abrahamson, 507 *472 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)); see also id. at 2198-99 (explaining that the Brecht standard “subsumes” the requirements of AEDPA, which “sets forth a precondition to the grant of habeas relief’ (quoting Fry v. Pliler, 551 U.S. 112, 119-20, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007))). Specifically, the inquiry is whether, in light of the record as a whole,-the improper limitation on defense counsel’s closing argument substantially influenced the verdict. Brecht, 507 U.S. at 638-39, 113 S.Ct. 1710.
The jury heard overwhelming evidence that Frost committed the charged offenses. The prosecution introduced Frost’s recorded confessions, and he testified that he participated in the robberies and the burglary. The prosecution also linked evidence found in Frost’s home to. the crimes. On this record, any argument that the prosecution failed to meet its burden of proof would have fallen on deaf ears. Accordingly, Frost wasn’t prejudiced by the superior court’s error in denying him the right to make that argument. See Brecht, 507 U.S. at 637-38, 113 S.Ct. 1710; see also Davis, 135 S.Ct. at 2199.
II. The Brady and Napue Issues.
Frost maintains that the prosecution withheld material, exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He claims that the evidence would have undermined the testimony of Edward Shaw, a key prosecution witness. He also argues that-the prosecution called Shaw to testify falsely about the existence .of that exculpatory evidence in violation of Napue v. Illinois, 360 U.S. 264, 269-70, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).
Shaw wasn’t involved in the robberies and burglary at the heart of the prosecution’s case. Rather, he was an acquaintance who testified about how Frost interacted with ringleader Matthew Williams, who Frost claimed coerced him into participating in the crimes. In April 2003, Shaw met with detectives to discuss what he knew about Frost’s involvement. At that time, Shaw had pending charges for unlawful possession of drugs and a firearm. Shaw asked for favorable treatment in.exchange: for information about Frost’s criminal activity but the prosecution refused to make a deal. Nevertheless, Shaw disclosed what he knew. Frost was arrested the same day. State v. Frost, 161 P.3d at 364.
.Subsequently, but before Frost’s trial, Shaw was charged with second-degree assault with a deadly weapon growing out of a domestic-violence .incident. In November 2003, a few weeks before Frost’s trial, Shaw signed two plea agreements. He received a nine-month sentence for all his crimes, conditioned on his testifying truthfully against Frost.
At trial, Shaw testified. that Frost was “giggling” when Shaw asked whether he was involved in the robberies and burglary. The prosecution highlighted this testimony in its ’ closing: “When Mr. Shaw talked to the defendant about his involvement in these robberies, the defendant was giggling. Does that sound like duress?”
Shaw also testified about the plea agreement for his unlawful-possession case. The prosecution introduced an unsigned version of that' agreement. Shaw testified that the signed .version was the same as the one the state presented at trial. Shaw didn’t mention that he signed a separate agreement resolving his domestic-violence charges, which provided that the sentence for that offense would run concurrently with that for unlawful possession. The prosecution did'not disclose the existence *473 of Shaw's domestic-violence plea agreement or otherwise correct his testimony.
■Nor was the signed version of' Shaw’s unlawful-possession plea agreement identical to the unsigned version; it contained a handwritten reference to his domestic-violence case number. The prosecution didn’t produce -the annotated version of the -Unlawful-possession plea agreement or the domestic-violence plea agreement. Rather, the prosecution waited until two days after Frost was convicted to file both plea agreements in Shaw’s state-court cases. The state doesn’t dispute that the prosecution was required by Brady to turn over both plea agreements before Frost’s trial.
In March 2008, shortly after exhausting his direct appeal, Frost sent a letter requesting “any documentation that could be used to establish the credibility and or expierance [sic] Mr. Shaw has or had as a Police Informant” The public records officer responded by identifying several docket numbers involving Shaw, including his domestic-violence ease. The records officer estimated that there were “1000 pages of documents” responsive to Frost’s request, which would cost $195.00 to copy and ship. In his reply, Frost explained that he wasn’t “looking for complete case files, as that would be quite expensive.” Rather, he sought “any documents” that could show “any special- treatment [Shaw] was given in regards to ... cooperation with [the prosecuting-attorney’s] office or the King County Police Department.” The records officer responded that she did not “find- any ■ records responsive ' to [Frost’s] request.”
Frost persisted: He wrote back that he-knew Shaw had given statements in a particular case, which he identified by number. He asked the records officer to “please try and comb-through the abové-mentioned - case files” for Shaw’s statements and “please -send [Frost] a list of any and all King County Police Case Numbers brought up in those files.” The: records officer responded by identifying two docket numbers — neither of which was the domestic-violence case — and informing Frost that she found a statement that Shaw made in the unlawful-possession case file. No documents were provided pertaining. to the domestic-violence case. Frost,, filed a personal restraint petition shortly afterward in which he raised a number of claims for relief, but. didn’t allege any Brady or Napue violations.
- The undisclosed plea agreements first came to light in 2009 when the Federal Public Defender for the Western District of Washington,- appointed by the district court to' represent Frost in his federal habeas proceeding, searched Shaw’s records at the- King County Superior Court Clerk’s Office. Counsel quickly filed another personal restraint petition based on this evidence,- but the Washington Supreme Court denied it as untimely.-. The federal magistrate judge found that the supreme court relied on a valid procedural rule in dismissing Frost’s Brady and Na-pue , claims and that Frost hadn’t ¡shown cause to overcome this default. .
In objecting to the magistrate judge’s report and recommendation, Frost argued that the prosecution’s continued failure to disclose the domestic-violence plea agreement frustrated his ability to raise timely Brady and Napue claims. He presented his 2008 communications with the King County Prosecuting .Attorney’s Office. Accordingly, he.asserted that he had cause for- his procedural default.;
> The district judge adopted the magistrate judge’s report and recommendation in full. He concluded that Frost’s evidence didn’t demonstrate that the prosecuting attorney’s office engaged- in “persistent efforts to suppress” impeachment evidence. - The district judge also found *474 that Shaw’s testimony wasn’t pivotal- in light of the prosecution’s ample evidence establishing Frost’s involvement in the charged crimes. The district judge declined to grant certificates of appealability on Frost’s Brady and Napue claims.
A. .
The standard for granting a certificate of appealability is low. Shoemaker v. Taylor, 730 F.3d 778, 790 (9th Cir.2013) (as amended). All that’s required is that “reasonable jurists could debate” whether the petition states a “valid claim of the denial of a constitutional right” and whether the district court “was correct in its procedural ruling.” Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), As explained below, these issues are at least' debatable and implicate Frost’s constitutional rights. Accordingly,- Frost has met the standard for granting a certificate of appealability, and we do so here.
B.
Because the Washington Supreme Court held that Frost defaulted on his Brady and Napue claims, he must overcome the default by showing cause and prejudice. See Strickler v. Greene, 527 U.S. 263, 282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
Cause. Frost started researching his Brady and Napue claims well before the deadline for filing a personal restraint petition had passed. The Supreme Court denied Frost’s petition for certiorari on January 14, 2008, see Frost v. Washington, 552 U.S. 1145, 128 S.Ct. 1070, 169 L.Ed.2d 815 (Jan. 14, 2008), so he had until January 14, 2009 to seek relief through collateral review. ’ See Wash. Rev.Code § 10.73.090(2), (3)(c) (2008). Frost made his first inquiry to the King County Prosecuting Attorney’s Office about documents that would call Shaw’s credibility into question in March 2008. The dissent faults Frost for not promptly discovering all the documents he.was looking for, noting that his federal habeas .counsel was able .to do so later with, ease. Diss. at 482-83. But federal, habeas counsel reviewed Shaw’s felony files at the King County Superior Court Clerk’s Office. Unlike his federal habeas counsel, Frost was incarcerated, and so had to write to the prosecuting attorney’s office to request information; Had the prosecuting attorney’s office — which was guilty of hiding the information in the first place — responded accurately to Frost’s document requests, he could have filed a timely petition.
Frost first asked for “any documents ... that could be used to establish the credibility ... Mr. Shaw has or had as a Police Informant.” The records officer represented that she could provide complete case files for $195 or that Frost could narrow his search. It is hardly fair for the dissent to fault Frost for “declining” to buy the entire case files, Diss. at 484, as $195 is a tremendous amount for an indigent prison inmate. Frost reasonably chose the second option (narrowing the search) by asking for “any documents ... in regards to any special treatment [Shaw] was given in regards to ... cooperation with your office or the King County Poliee Department,” Rather than disclosing either of Shaw’s plea agreements, the officer responded that she did “not find any records responsive to [Frost’s] request.” When Frost rephrased his query as for “information ... that would show [Shaw’s] ■reliability,” the records officer again failed to turn anything over. The dissent analyzes the same correspondence between Frost and the King County Prosecuting Attorney’s Office but ignores how the public records department’s false answers misled- Frost about the contents of the files in *475 its possession and thus prevented Frost from obtaining evidence to support his claims. Diss. at 483-84.
The dissent’criticizes Frost-for abandoning'his pursuit of impeachment evidence, Diss. at 484, but he diligently asked for this information on multiple occasions. He was reasonable in abandoning his investigation after the prosecution falsely advised him on repeated occasions that it - had no information supporting his Brady and Na-pue claims.
That Shaw’s plea agreements were not filed until two days after Frost was convicted, even though they had been signed weeks earlier, seems like more than carelessness on the prosecution’s part. And its later failure to disgorge Shaw’s plea, agreements, despite Frost’s repeated requests, may amount to “interference by officials” that supplies cause to excuse Frost’s procedural default. Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (quoting Brown v. Allen, 344 U.S. 443, 486, 73 S.Ct. 397, 97 L.Ed. 469 (1953)). At the least, it shows “some .objective factor external to the defense” that prevented Frost from complying with Washington’s rule setting time limits for bringing personal restraint petitions. Id,; accord Amadeo v. Zant, 486 U.S. 214, 222, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988).
Frost filed a personal restraint petition in 2008 raising multiple claims for relief. No doubt, he would have presented allegations of Brady and Napue violations in that petition, had he been aware of the facts supporting those arguments. “[T]he reason for [Frost’s] failure to develop facts in [s]tate-court proceedings was the [sjtate’s suppression of the relevant evidence.” Banks v. Dretke, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (citing Strickler, 527 U.S. at 282, 119 S.Ct. 1936). Accordingly, Frost has demonstrated cause for failing to raise his Brady and Napue claims in his 2008 personal restraint petition. See, e.g., Amadeo, 486 U.S. at 222, 108 S.Ct. 1771 (finding “ample cause to excuse [a petitioner’s] procedural default” where county officials concealed a key document and counsel had no tactical reason for failing to raise the claim); Crawford v. Head, 311 F.3d 1288, 1327 (11th Cir.2002) (petitioner demonstrated cause where state failed to disclose Brady material in its possession despite multiple requests from counsel); Crivens v. Roth, 172 F.3d 991, 995 (7th Cir.1999) (petitioner had cause to overcome procedural default of Brady claim where prosecution didn’t provide the criminal record of its witness until after the habeas petition was filed).
Prejudice. While Frost has shown cause, he cannot show prejudice. Given the evidence of, guilt presented at trial, there is no “reasonable likelihood” that Shaw’s-false-testimony about only having one plea agreement could have “affected the judgment-of .the jury.” Sivak v. Hardison, 658 F.3d 898, 912, 914 (9th Cir.2011) (quoting Jackson v. Brown, 513 F.3d 1057, 1076 (9th Cir.2008)) (finding no prejudice at trial from a Napue violation -where the defendant’s own testimony and physical evidence “pointed to his guilt”). Had the jury learned of Shaw’s second plea agreement, there is no “reasonable probability” that the outcome' would have been different. See Strickler, 527 U.S. at 296, 119 S.Ct. 1936.
■ Shaw’s undisclosed domestic-violence offense carried a maximum sentence of five years — the same as’ his unlawful-possession offenses. It is unlikely that the prosecution could have put pressure on Shaw to change his testimony by threatening to seek consecutive sentences for his offenses. In Washington, there is a presumption that sentences imposed at the same time will be served concurrently. *476 Wash. Rev.Code § 9.94A.589(1)(a); State v. Vance, 168 Wash.2d 754, 230 P.3d 1055, 1058-59 (2010) (en banc).. Nothing in the record suggests that the state could have overcome this presumption. Neither of Shaw’s crimes were “serious violent offenses.” Wash. Rev.Code § 9.94A,030(37) (2002) (defining “serious violent offense”); id. § 9.94A.589(l)(b) (requiring consecutive sentences for defendants who’ve committed .two or more serious violent offenses). Nor is there evidence of any other factor that Washington courts normally rely on in justifying consecutive sentences, such as the use of a “high degree of sophistication or planning,” or an abuse of a “position of trust.” See id. § 9.94A.535(2)(e)(v)-(vi).
While Frost could have shown that Shaw was a bad guy because he not only unlawfully possessed a firearm and drugs but also assaulted his girlfriend, it wouldn’t have gotten him far. The jury already knfew that'Shaw received benefits in exchange for his testimony. The jury also heard that Shaw gave information- about Frost’s crimes to the police even after they declined a deal on his pending unlawful-possession charges. And the jury was aware that Shaw approached authorities with information about Frost in April, well before he committed the assault in August.
Any- impact of this impeachment evidence would have been vitiated by Frost’s own testimony, which cast doubt on his duress defense. Frost didn’t have a good' answer for why he didn’t attempt to escape from Williams when he had a chance. He admitted that he was left alone in the car when his accomplices committed one of the robberies. Frost also admitted that he picked up Williams on several occasions, as Williams didn’t have a car. Frost acknowledged that he never tried to get his mother and brother to a safe place in response to Williams’s alleged threats against them. Nor did he call 911, although he’d previously done so when he felt threatened by others. Finally, Frost admitted that, during his first interview with the police, he didn’t say that he had been threatened by Williams, even though the officer twice urged him.to say “anything” he wanted. There’s no reasonable likelihood that the jury could have acquitted Frost based on his duress defense, even if they had learned of the undisclosed plea agreements.
C.**
Although we -conclude' that Frost is not entitled to relief, we find the fácts giving rise to his Brady and Napue claims most troubling. As the matter has been presented to us, there is cause to believe that the King County Prosecuting Attorney’s office'violated Brady and Napue by willfully withholding evidence of Shaw’s domestic-violence plea deal and by permitting Shaw to lie on the stand. That this wa’s a deliberate tactic rather than an oversight is demonstrated by the fact that the prosecution kept Shaw’s signed plea agreements secret until two" days after Frost was convicted, even though they had been signed well before Frost’s trial commenced and thus should have been turned over to the defense at once. Moreover, subsequent to the trial, the office stonewalled in providing Frost this information when he doggedly requested it.
So far as we are aware, the individuals involved have never been held to account for their conduct. As the dissent acknowledges, the deputy prosecuting attorney 'in Frost’s case, Zachary Wagnild, introduced into evidence an unsigned plea agreement that he suffered the witness to testify was identical to the signed version. *477 Diss. at 480. The difference between the two documents was material, as the signed version revealed the existence of the second plea deal. The dissent chalks this all up to a case of “the left hand [not knowing] what the right hand was doing” in a busy office with multiple prosecuting attorneys. Diss. at 485-86. But it’s more akin to one hand washing the other. We know that Wagnild was aware of the domestic-violence case because he signed the plea agreement in the unlawful-possession case, which referred to Shaw pleading guilty in his domestic-violence case. The unlawful-possession agreement was dated November 26, 2003 — before Frost’s trial. There was thus no reason to use an unsigned version where the signed version was available and had, in fact, passed through Wagnild’s hands. Yet Wagnild did not produce the signed plea agreement as required by Brady, and he failed to correct Shaw’s representation that the two versions were identical (but for the signature). Having himself signed the original, he was charged with knowledge of its contents; he certainly knew how to get the original to confirm that the documents were indeed identical. Allowing a prosecution witness to testify falsely when the truth is easily verifiable not only violates Napue but would also amount to professional misconduct.
We are also troubled by the conduct of Gary Emsdorff, the deputy prosecuting attorney who handled Shaw’s domestic-violence case. Shaw’s plea agreement in the domestic-violence case referenced his unlawful-possession- plea agreement, which obligated him to • testify truthfully in Frost’s case. It is possible, though unlikely, that filing the plea agreement in Shaw’s domestic-violence case two days after the jury returned its verdict in Frost’s case was mere coincidence. But filing'it on the same day as the unlawful-possession plea agreement bespeaks coordination and planning. ' The domestic-violence plea agreement had been signed on November 3, a month before Frost’s trial even began, but it-was kept secret Until it was too late for Frost to use it in his defense. The state has offered no explanation for delaying the filing of both plea agreements until after -the - jury returned its verdict in Frost’s case. The dissent sees this all as innocent carelessness, but to us it’s at least one coincidence too far. The sequence of events raises the inference that Emsdorff collaborated with Wagnild to conceal the agreement from Frost until Wagnild had secured a guilty verdict. If so, this would be shameful misconduct on the part of both prosecuting attorneys, which not even the dissent denies.
Finally, we are concerned by the actions of Kelli Williams, the public records officer for the King County Prosecuting Attorney’s office at the time Frost sought information about Shaw. Frost asked that office, in every way he knew hoW, for the information that would have supported his Brady and Napue claims. Yet Williams provided incorrect or misleading information in response to his requests. Her failure to identify and disclose either plea agreement to Frost may be the result of incompetence or indolence, but it may also reflect a deliberate effort to prevent disclosure of the deception committed by her office.
Although the Washington courts presumably have been aware of these facts for some time, we.have been apprised of no sanctions against thesé individuals, nor any inquiry conducted by the courts. Nor have we heard of any effort to hold Shaw accountable for the perjury he almost certainly committed in his testimony in Frost’s case or to determine the degree to which' he may have- been aided in that endeavor by prosecuting attorney Wagnild.
*478 We are mindful that there may be circumstances of which we are unaware that cast the matter in a different light. Yet, unlike the dissent, we do not believe this is a sufficient reason to keep silent. The individuals we have named may wish to furnish a copy .of this opinion to the- state bar and seek to clear their names by providing an explanation for its consideration. This would seem to be the prudent course. * ❖ *
Because Frost can’t show prejudice as a result of the errors committed at his trial,he is entitled to no relief in federal court:
AFFIRMED.

 Judge Nguyen does not join this section of the opinion.