KRONSTADT, District Judge,
concurring in part and dissenting in part:
I concur with the conclusion of the majority that “[t]he district court was not obligated to develop alternative theories to support the Nevada Supreme Court’s decision.” I also agree with its statements that “Nevada Revised Statute section 194.010 creates a presumption that children (between the ages of eight years and fourteen *542 years) lack the capacity to distinguish right from wrong” and that as a result, “the prosecution bears the burden of rebutting this presumption by establishing, through clear proof, ‘that at the time of committing the act .., [the child] knew its wrongfulness.’” (quoting Nev. Rev. Stat. § 194.010). Finally, I agree with the majority’s description of the Brecht standard, which on collateral review governs the determination of whether an error is harmless, as clarified in Davis v. Ayala, — U.S. -, 135 S.Ct. 2187, 192 L.Ed.2d 323 (2015). I disagree, however, with the application of the Brecht standard by the majority to the record evidence. Therefore, I respectfully dissent from its conclusion that “[t]he trial court’s failure to provide the jury with an instruction regarding Nevada Revised Statute section 194.010 was not a harmless error.”
As the majority observes, “[t]he government contends that, even without the instruction, the record contains sufficient evidence indicating that Elvik understood the wrongfulness of his actions.” The majority then states that the evidence in the record is “mixed” and concludes that “[o]n the basis of the full record and given the state’s burden of proof we are persuaded that had the jury been properly instructed, there was a reasonable probability the jury would have acquitted him, not merely a reasonable possibility that they could have.” It is with these conclusions that I respectfully disagree.
In my view, the record evidence is not “so evenly balanced” that a judge could feel “in virtual equipoise as to the harmlessness of the error” or have “grave doubt about whether an error affected a jury [substantially and injuriously] — ” Merolillo v. Yates, 663 F.3d 444, 454 (9th Cir. 2011) (alteration in original)(internal quotation marks omitted) (citing O’Neal v. McAninch, 513 U.S. 432, 435, 437-38, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)). Instead, a consideration of the record evidence as a whole supports the conclusion that the error did not have a substantial and injurious effect or influence on the verdict. For these reasons, “on the record in this case, [defendant] cannot establish actual prejudice •_” Davis, 135 S.Ct. at. 2203.
The following record evidence, some of which is cited by the majority, in my view shows that Elvik had a level of sophistication and understanding that would cause any reasonable jury to conclude that, when he shot and killed the victim, Elvik knew the difference between right and wrong;
1. Elvik previously had been arrested for stealing a motor vehicle.
2. After the shooting, Elvik took the victim’s briefcase and handgun. The briefcase contained the victim’s money clip and the keys to his vehicle. Elvik then drove the victim’s vehicle nearly five hundred miles from Carson City, Nevada to Costa Mesa, California.
3. After arriving in California, Elvik contacted his 13-year-old girlfriend, picked her up in the victim’s vehicle, and checked into a motel with her for the night. He took the victim’s handgun and money clip into the motel room.
4. The day after the shooting, at approximately 3:00 a.m., California law enforcement personnel, who had become aware of the events in Nevada, identified the vehicle outside the motel as the one that belonged to the victim of the shooting. They contacted the person working at the front desk of the motel from whom they learned that Elvik was the guest associated with that vehicle. Shortly thereafter, the person at the front desk called the room in which Elvik and his girlfriend were staying and told him to flee. Elvik and his girlfriend left the room. Elvik jumped from the bal *543 cony. Although his girlfriend was promptly apprehended, Elvik evaded law enforcement personnel for the next 14 hours. During that time, he hid the victim’s handgun and money clip.
5. Elvik testified at trial that he later went back and retrieved the handgun because he “didn’t want nobody to find it. I didn’t want some little kid to find it, or shoot, you know, or anything like that.”
6. Upon being detained, but prior to his arrest, Elvik gave a false name to the police. He later told them his actual name.
7. After being held, and given a Miranda warning, Elvik initially denied any recollection of the shooting. He stated that he had taken LSD and that this likely clouded his memory. Later in that interrogation, Elvik admitted to shooting the victim. At trial, Elvik stipulated that a blood test showed that he was not under the influence of LSD, and he testified that he had lied when he told the police otherwise.
8. During the same interrogation, Elvik asked whether his actions in Nevada would result in his confinement in a juvenile hall in Nevada or California. This showed sophistication about the link between where a crime is committed and the place of any resulting confinement.
9. During the same interrogation, Elvik stated that he had considered leaving the victim’s handgun with Elvik’s friend Stephen. He stated, “I didn’t want to give it to [Stephen] because I guess he’s like on probation for doing drugs or something. So I didn’t want him to get in trouble for it but, you know?” He stated that he then decided to give the gun to Stephen with the expectation that Stephen would “take it over to [Elvik’s] mom’s office or whatever or the police station or whatever he’s going to do with it.”
10.At the time of the shooting, Elvik was 14 years and 11 months old. Thus, within a month he no longer would have qualified for the instruction under Nev. Rev.Stat. § 194.010(2)'.
In my view, a consideration of the other evidence in the record, some of which is also mentioned by the majority, does not show that the totality of the evidence was “equally balanced” such that a judge could be in equipoise as to the issue of harmless error. Elvik relies on the following evidence to support his contrary position:
1. During his interrogation, he referred to his mother, who had disowned him and denied his request to return to her in California, by using a crude expletive;
2. He stated that he might not have a long life ahead of him because there might be “some big earthquake” and he might “fall in the crack and then [ ]die”;
3. He answered some questions with “ah huh” instead of “yes” during his interrogation;
4. He did not surrender to the police because he was “scared” and did not “think anyone would believe” him, something consistent with the recognition that' he knew that his conduct was wrongful;
5. During the interrogation, after being told that “everybody’s going to know exactly what happened” and that this was Elvik’s “chance to fill in, maybe, a couple of little minor details,” Elvik asked “why does it matter, whatever I tell you?” However, in context, these words demonstrate that Elvik was asking why he needed to state what he had done given the evidence the police already had collected[1]; and
*544 6. At the conclusion of the initial interrogation, Elvik asked if he would be sent to juvenile hall in Nevada or California. As stated above, this reflects sophistication. Moreover, even if this implied that Elvik misunderstood the seriousness of the punishment that might be imposed for killing the victim, it did not imply that he did not know that his conduct was wrongful.
To make the determination of “whether a trial error of federal law had substantial and injurious effect or influence in determining the jury’s verdict” Davis, 135 S.Ct. at 2198 (internal quotation marks omitted) (quoting O’Neal, 513 U.S. at 436, 115 S.Ct. 992), it is necessary to consider the effect of the error in light of all the.evidence presented to the jury. The question is not whether the jury was “right in their judgment” but is, instead, “what effect the error had or reasonably may be taken to have had upon the jury’s decision.” Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). This analysis “must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened.” Id. A conviction may not be overturned on “mere speculation that the defendant was prejudiced by trial error”; actual prejudice must be suffered. Calderon v. Coleman, 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998); see also Fry v. Pliler, 551 U.S. 112, 119, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007); Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Thus, “[t]here must be more than a ‘reasonable possibility’ that the error was harmful.” Davis, 135 S.Ct. at 2198 (quoting Brecht, 507 U.S. at 687, 113 S.Ct. 1710). In assessing actual prejudice to the defendant, all relevant record evidence should be considered.
For these reasons, which are based on a review of the relevant record, I am not persuaded that Elvik suffered actual prejudice because the instruction that he requested was not read to the jury. Given the evidence at trial, I respectfully disagree that a reasonable jury could have concluded that Elvik did not understand the wrongfulness of his actions. That killing another person is wrongful is among the oldest and best established rules of civilization. As such, “[t]here is no basis for finding that [defendant] suffered actual prejudice.... ” Davis, 135 S.Ct. at 2208.

. After being asked to "fill in the little details” because the police "d[id]n't know exactly, you know, step by step what happened," Elvik asked, “Well, what does it matter anyway[?]’’ After being told that what happened was not "going to be a real big mystery,” Elvik asked, *544 "Yeah, I know, so why ... why does it matter, whatever I tell you?” Elvik later stated, "Well ... well, you obviously already know what happened, so what does it matter what I say?” Subsequently, after being told that his girlfriend had stated that Elvik told her that he shot the victim, Elvik responded, "It doesn’t matter anyways.” Later, after being asked whether the victim fell on his back or on his stomach after being shot, Elvik stated, "So, even if I do know, what is it ... who cares?” After being told that things were "f* * * * * right now” and that they were "going to stay that way for awhile,” Elvik asked, "So what's the difference if they’re going to stay like that?”